THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RATA HILL, Defendant-Appellant.

First District (4th Division)   No. 1—02—1387

Opinion filed December 24, 2003.

Michael J. Pelletier and Shobha L. Mahadev, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Michelle L. Patsy, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THEIS delivered the opinion of the court:

Following a bench trial, defendant Rata Hill was convicted of possession of a stolen motor vehicle and possession of a controlled substance. As a result of his prior convictions, the trial court sentenced defendant to eight years' imprisonment for possession of a stolen motor vehicle under the mandatory Class X sentencing provision of section 5—5—3(c)(8) of the Unified Code of Corrections (the Code) (730 ILCS 5/5—5—3(c)(8) (West 2000)), concurrent to his one-year sentence for possession of a controlled substance. On appeal, defendant argues that (1) his due process rights were violated where there was a *bona fide* doubt of his fitness to stand trial and the trial court failed to hold

a fitness hearing; (2) he was not proved guilty beyond a reasonable doubt of possession of a controlled substance because the State failed to establish a proper foundation for the opinion given by the forensic chemist; and (3) the mandatory Class X offender provision is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and the Illinois Constitution. For the following reasons, we affirm.

Defendant was charged with possession of a stolen motor vehicle, possession of an altered temporary registration permit, and possession of a controlled substance with intent to deliver. Prior to trial, on September 5, 2001, the trial court granted defense counsel's request to order a clinical examination of defendant. On October 15, 2001, Dr. Michael Rabin of Forensic Clinical Services sent his report to the trial court. Dr. Rabin stated that he had examined defendant and found that defendant did not "display indications of current psychosis, serious mood disorder, or cognitive defects, but does have a history of mood disorders and does display current depressed mood." Defendant reported to Dr. Rabin that he was not taking any psychotropic medications at that time. Dr. Rabin opined that based on his clinical evaluation and record review, defendant was fit to stand trial. He stated that defendant was aware of the charges and proceedings pending against him, was able to cooperate and was competent to assist counsel in his own defense.

The court received this letter on October 25, 2001, and noted that it indicated that defendant had been recently released from psychiatric care. On its own motion, the court ordered a second examination and instructed defendant's family members to tender information concerning his psychiatric history to the examiner. On January 3, 2002, Dr. Philip Pan of Forensic Clinical Services submitted a report to the court. In that letter, Dr. Pan diagnosed defendant with "polysubstance dependence, malingering, and rule-out (or possible) bipolar disorder" and noted that defendant had a history of antisocial personality disorder. Dr. Pan stated that he could "come to no definitive opinion in regards to defendant's fitness to stand trial, due to defendant's lack of cooperation," and indicated that he had attempted to interview defendant twice. However, Dr. Pan found that the available clinical data "does not support that defendant suffers from a major mental illness." In reaching these conclusions, Dr. Pan reviewed police investigation reports, psychological summaries, treatment records from Madden Mental Health Center, psychosocial history and various court documents and correspondence.

On January 7, 2002, the trial court received Dr. Pan's report and the following colloquy occurred:

"THE COURT: Before the Court we have the return of a report from Forensic Clinical Services by Dr. Pan, in which Dr. Pan was unable to come to a definitive opinion regarding the defendant's fitness to stand trial, due to the defendant's lack of cooperation.

What's your pleasure, counsel?

[DEFENSE COUNSEL]: I would be asking that the case be set for trial.

* * *

THE COURT: Mr. Hill, the doctor does find, from the available clinical data that he had, that you do not suffer from any major mental illness."

The case proceeded to trial.

At trial, both parties waived opening statements. Officer Michael Vogenthaler of the Chicago police department testified that at 8:45 p.m. on April 29, 2001, he and his partner, Officer Bechina, were in an unmarked vehicle near 103rd and Halsted Streets. Vogenthaler then noticed a 1994 Toyota Camry without licence plates turn into a gas station at that corner. He identified defendant as the driver of that vehicle. Vogenthaler did not see a temporary registration sticker on the car at that time. When Vogenthaler pulled behind defendant's vehicle and activated his emergency equipment, defendant exited the car and fled on foot. Vogenthaler chased defendant and detained him while Bechina stayed with the vehicle. Vogenthaler then asked defendant for his driver's license and defendant stated that his license was suspended. Vogenthaler arrested defendant and performed a custodial search where he recovered a black container with 14 clear plastic bags, "all containing a rock-like substance which [he] believed to be cocaine" from defendant's right front pants pocket. Vogenthaler inventoried the bags under inventory number 2511074. Vogenthaler then checked the vehicle identification number (VIN) on the vehicle driven by defendant and discovered that it was owned by Arquella Garner and was reported stolen. While inside the vehicle, Vogenthaler found a temporary registration sticker on the back window with a different VIN than the VIN on the car.

The parties stipulated that, in the police station later that evening, Vogenthaler advised defendant of his *Miranda* warnings. Vogenthaler testified that defendant understood his rights and waived them. Defendant told Vogenthaler that he knew the car was stolen and that he bought it from someone for two bags of cocaine. When Vogenthaler asked him why he ran from the police, defendant responded that "he knew the car was hot and he had *** some rocks in his pocket." Defendant also stated that he placed the temporary registration sticker in the window so he could drive the vehicle "because he knew the

plates would come back hot." Vogenthaler testified that he recorded defendant's statement in his case report, but did not prepare a handwritten statement for defendant to sign.

The parties then stipulated:

"If [Jeanna Dufresne Walock] were called to testify, she would state she's a forensic scientist employed by the Illinois State Police Crime Lab.

She would be qualified as an expert in the field of narcotics testing. She would testify she received the fourteen items in a sealed condition under Inventory No. 2511074. She weighed the items, found they were approximately 2.2 grams.

She tested the some the [sic] fourteen items and found within a reasonable degree of scientific certainty they were positive for cocaine 1.1 grams.

No evidence of tampering. Proper chain of custody maintained."

The parties also stipulated that if Arquella Garner were called to testify, she would state that she was the owner of the 1994 Toyota Camry and that on April 29, 2001, she did not give defendant permission to possess her vehicle. The State then rested.

Defense counsel made a motion for a directed finding as to all counts, without argument. The court found defendant not guilty of possession of an altered registration permit and found that with respect to the possession-of-a-controlled-substance-with-intent-to-deliver count, the State proved the lesser included offense of possession only. The defense then rested and both parties waived closing arguments. The court found defendant guilty of possession of a stolen motor vehicle and possession of a controlled substance.

After trial, defendant's mother, Cynthia Hill, filed a motion for a new trial, stating that she was never informed of defendant's psychological testing results and that she was not given an opportunity to give the court his medical records. In her colloquy with the court without defendant and his counsel present, she was informed by the court that defendant was evaluated by the psychiatric institute and Ms. Hill agreed that she was interviewed for that evaluation. Ms. Hill was concerned about the records of defendant's previous hospitalizations, but stated that she informed the institute of these hospitalizations in her interview. The court explained that anything she told them was part of their report and that the records were submitted to the institute and were taken into consideration with their evaluation. The court then denied Ms. Hill's motion.

The next day, the court denied defense counsel's motion for a new trial. After obtaining the presentence investigation report (PSI), the court asked defense counsel if she had any corrections. Defense counsel

stated that she reviewed the report with defendant and although the PSI stated that defendant had only been hospitalized twice for mental health issues, counsel clarified that defendant had been hospitalized numerous times at many different hospitals. The court then informed defense counsel of Ms. Hill's motion and stated that it was the court's understanding that the doctors from the psychiatric institute had the records from defendant's previous hospitalizations before they completed their evaluation. Defense counsel agreed. The court asked defense counsel if "since the finding do you have any reason to believe that another behavioral clinical examination should be ordered?" and she responded, "Honestly, Judge, no. There is no new information I have. Nothing additional."

The court sentenced defendant as a Class X offender to eight years' imprisonment for possession of a stolen motor vehicle and one year's imprisonment for possession of a controlled substance, to run concurrently, and recommended mental health treatment. After defendant's motion to reconsider his sentence was denied, defendant then filed this timely appeal.

Defendant first argues that his due process rights were violated where the trial court had a *bona fide* doubt as to defendant's fitness to stand trial and the court proceeded to trial without holding a fitness hearing. He contends that, by agreeing to defendant's request for a fitness examination and ordering a second exam on its own motion, the trial court implicitly concluded that it had a *bona fide* doubt as to defendant's fitness. At this point, the court was required to hold a fitness hearing and its failure to do so dictates that his convictions be reversed. The State responds that the trial court never had a *bona fide* doubt of defendant's fitness, and thus, its duty to hold a fitness hearing was never triggered.

■ The due process clause of the fourteenth amendment prohibits the conviction and sentencing of a defendant who is not fit to stand trial. U.S. Const., amend. XIV; *People v. Johnson*, 206 Ill. 2d 348, 361, 794 N.E.2d 294, 303 (2002). In Illinois, a defendant is presumed fit to stand trial and is considered unfit only if his mental or physical condition prevents him from understanding the nature and purpose of the proceedings against him or assisting in his own defense. 725 ILCS 5/104—10 (West 2000); *People v. Shum*, 207 Ill. 2d 47, 57, 797 N.E.2d 609, 615-16 (2003). When a *bona fide* doubt as to defendant's fitness to stand trial exists, the court must order a fitness hearing to resolve the question of fitness before the case proceeds any further. 725 ILCS 5/104—11(a) (West 2000); *Johnson*, 206 Ill. 2d at 361, 794 N.E.2d at 303.

Whether a *bona fide* doubt as to defendant's fitness arose is gener-

ally a matter within the discretion of the trial court, and we will not reverse its decision absent an abuse of that discretion. *People v. Steppan*, 322 Ill. App. 3d 620, 628, 751 N.E.2d 32, 39 (2001). Here, the trial court never found a *bona fide* doubt as to defendant's fitness. After the court received the second doctor's report and asked defense counsel how she wished to proceed, defense counsel asked to set the case for trial. Although the court did not expressly state that it found defendant fit, by proceeding with trial, the court implicitly found no *bona fide* doubt as to defendant's fitness.

■ Defendant relies mainly on one sentence in *People v. Cleer*, 328 Ill. App. 3d 428, 766 N.E.2d 311 (2002), to support his argument. In *Cleer*, the Third District of this court held that when the trial court accepted defendant's motion for a fitness evaluation and hearing and appointed a qualified expert, "the trial court implicitly concluded that a *bona fide* doubt as to the defendant's fitness did exist," and thus, the court erred in failing to conduct a fitness hearing. *Cleer*, 328 Ill. App. 3d at 431, 766 N.E.2d at 314. Based on *Cleer*, defendant argues in the present case that by merely appointing an expert to examine defendant upon defendant's motion, the court implicitly concluded that a *bona fide* doubt as to defendant's fitness existed, regardless of the outcome of the exam or any other considerations.

We find this statement in *Cleer* contrary to both the language of the statute and settled supreme court precedent and decline to follow it. First, the sole support cited for this holding is section 104—11(b) and (c) of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—11(b), (c) (West 2000)). Section 104—11(b) states in relevant part: "Upon request of the defendant that a qualified expert be appointed to examine him or her to determine prior to trial if a bona fide doubt as to his or her fitness to stand trial may be raised, the court, in its discretion, may order an appropriate examination." 725 ILCS 5/104—11(b) (West 2000). This statute specifically contemplates such appointments to determine **whether** a *bona fide* doubt of defendant's fitness exists and lends no support for *Cleer*'s holding. Appointment of an expert under this provision cannot be considered a conclusion concerning a *bona fide* doubt of defendant's fitness but, rather, merely allows an expert to examine the defendant to determine **if** a *bona fide* doubt "may be raised."[1] As discussed above, when a *bona fide* doubt of defendant's fitness is raised, the trial court must conduct a fitness

---

[1]The other section cited by *Cleer*, section 104—11(c), is inapplicable to this analysis and concerns only the trial court's procedure after "a bona fide doubt of defendant's fitness has been raised." 725 ILCS 5/104—11(c) (West 2000).

hearing. 725 ILCS 5/104—11(a) (West 2000). Thus, *Cleer's* holding, which dictates that trial courts must hold a fitness hearing every time an expert is appointed to examine a defendant, regardless of the outcome of that exam, contradicts the statute.

Additionally, this result is contradicted by our supreme court precedent. Our supreme court has repeatedly held that when determining whether a *bona fide* doubt of defendant's fitness exists, courts should consider the following factors: the defendant's irrational behavior, the defendant's demeanor at trial and any prior medical opinion on the defendant's competence to stand trial. *People v. Harris,* 206 Ill. 2d 293, 304, 794 N.E.2d 181, 190 (2002); *People v. Burt,* 205 Ill. 2d 28, 39, 792 N.E.2d 1250, 1259 (2001); *People v. Easley,* 192 Ill. 2d 307, 319, 736 N.E.2d 975, 986 (2000); *People v. Eddmonds,* 143 Ill. 2d 501, 518, 578 N.E.2d 952, 959 (1991). This test is an objective one. *Eddmonds,* 143 Ill. 2d at 518, 578 N.E.2d at 959. If the mere fact that the trial court granted a defendant's request for a psychiatric examination was sufficient to create a *bona fide* doubt of the defendant's fitness, these factors would be unnecessary and irrelevant. Further, our supreme court has stated that there are " 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.' " *Eddmonds,* 143 Ill. 2d at 518, 578 N.E.2d at 959, quoting *Drope v. Missouri,* 420 U.S. 162, 180, 43 L. Ed. 2d 103, 118, 95 S. Ct. 896, 908 (1975). Certainly, if *Cleer* was correct, a trial court's act of allowing the defendant to be examined by a psychiatric expert would be a "fixed or immutable" sign which would easily indicate the need for a fitness hearing. Additionally, in several recent cases, including *Shum, Johnson, Burt,* and *Harris,* our supreme court considered the defendants' behavior and demeanor at trial along with expert opinions as to defendants' fitness and rejected defendants' claims that there was a *bona fide* doubt as to fitness, despite the fact that the trial court had granted numerous defense requests for psychiatric evaluations. Based on section 104—11 and our supreme court precedent, we find that the trial court's decision to appoint an expert to examine a defendant has no bearing on the court's ultimate conclusion as to whether a *bona fide* doubt as to the defendant's fitness to stand trial has been raised. Accordingly, we reject *Cleer's* contrary holding and defendant's argument based on this statement.

■ After considering the three factors delineated by our supreme court, the defendant's irrational behavior, the defendant's demeanor at trial and any prior medical opinion on the defendant's competence to stand trial, we find that no *bona fide* doubt of defendant's fitness

existed, and thus, the trial court did not abuse its discretion in failing to conduct a fitness hearing. First, the two expert opinions concerning defendant's competence to stand trial support our finding that no *bona fide* doubt existed. Through Dr. Rabin's report, there is psychiatric evidence in the record to support the finding of defendant's fitness to stand trial. In his letter prepared a few months before trial, Dr. Rabin opined that defendant was fit to stand trial, was aware of the charges and proceedings pending against him, was able to cooperate and was competent to assist counsel in his own defense. Although the second expert, Dr. Pan, was not able to "come to [a] definitive opinion in regards to defendant's fitness to stand trial," this failure was due to defendant's lack of cooperation.

Dr. Rabin indicated that while defendant did have a history of mood disorders and a current depressed mood, defendant did not "display indications of current psychosis, serious mood disorder, or cognitive defects." While Dr. Pan diagnosed defendant with "polysubstance dependence, malingering, and rule-out (or possible) bipolar disorder" and noted that defendant had a history of antisocial personality disorder, he stated that defendant did not suffer from a major mental illness. Evidence that a defendant suffers from mental disturbances or requires psychiatric treatment does not necessarily establish that he is unfit to stand trial. *Shum*, 207 Ill. 2d at 59, 797 N.E.2d at 617; *Easley*, 192 Ill. 2d at 322, 736 N.E.2d at 987. Fitness to stand trial concerns only a defendant's ability to understand the proceedings and assist counsel, not mental fitness in other areas of life. *Easley*, 192 Ill. 2d at 320, 736 N.E.2d at 986. "A defendant can be fit for trial although his or her mind may be otherwise unsound." *Easley*, 192 Ill. 2d at 320, 736 N.E.2d at 986.

While these reports provide some evidence of mental illness, they are insufficient to counter the several indications in the record that defendant understood and participated at trial. *Shum*, 207 Ill. 2d at 60, 797 N.E.2d at 617. The record reveals that defendant exhibited no irrational behavior during any of the proceedings. Rather, his demeanor at trial demonstrated that he understood the nature of the proceedings and was able to assist in his own defense. Throughout the proceedings, defendant responded appropriately to the court's questions and indicated deference to the court's authority. On several occasions in the record, the court provided defendant with a detailed explanation of the proceedings and informed defendant of his rights. Following these admonishments, defendant indicated that he understood. Defendant also conferred with his defense counsel, expressed to the court his understanding of the proceedings, and waived his right to a jury trial and his right to testify in his own defense. See *Harris*, 206 Ill. 2d at 305, 794 N.E.2d at 190.

While defendant cites a portion of the record where defense counsel informed the court that she had explained a jury waiver to defendant, but she was concerned that he did not understand when he hesitated to sign it, to support his proposition that defendant was not fit for trial, this discussion further indicates that defendant understood the proceedings. In the following colloquy, the court carefully explained the difference between a bench and a jury trial and defendant indicated that he understood.

"THE COURT: Mr. Hill, do you understand what a jury trial is?

THE DEFENDANT: Yes. Yes, ma'am.

THE COURT: Okay. Twelve persons would be selected from the community. They would sit in the jury box behind you, those twelve seats, perhaps with two alternates.

They would listen to the evidence presented by the State and your evidence, should you choose to present any evidence, witnesses, should you choose to testify, you could testify.

I would give them the law. They would go back to that jury room, deliberate with the law, and sign verdict forms of guilty or not guilty.

Any questions about what a jury trial is?

THE DEFENDANT: No, ma'am.

THE COURT: If you wish to waive or give up your right to trial by jury, please sign the jury waiver in open court. If you're not sure if you want a bench or a jury trial, take all the time you want to decide what you want.

Bench trial is me deciding. Jury trial is twelve persons selected from the community along with you, your attorney, and State's Attorney.

THE DEFENDANT: Bench trial, ma'am.

THE COURT: Bench trial?

THE DEFENDANT: Yes, ma'am.

THE COURT: You understand that means I'm going to be deciding whether or not you are innocent or guilty?

THE DEFENDANT: Yes, ma'am.

THE COURT: Is this your signature on the jury waiver?

THE DEFENDANT: Yes, ma'am.

THE COURT: Did you understand by signing this jury waiver, that means you are not having a jury trial?

THE DEFENDANT: Yes, ma'am.

THE COURT: Jury waiver will be accepted."

After the State rested, the court asked defendant if he had an opportunity to speak with his lawyer and he replied, "Yes, ma'am. She was explaining some things." The court allowed defendant additional time to confer with his counsel and then carefully explained to

defendant his right to testify or to remain silent and defendant indicated that he did not want to testify. In his brief, defendant asserts that he "appeared confused at sentencing" when he stated, "[j]ust a lot of stuff going on. I just know I didn't—." However, the record reflects that defendant was emotional. Before defendant made this statement, the court informed him "Mr. Hill, is there anything you would like to say before I sentence you sir[?] Take your time, sir. Mr. Hill. Take some time. Compose yourself. Is there anything you would like to say?"

While the representation of defendant's counsel concerning his client's competence is not conclusive, it is another important factor to consider. *Eddmonds*, 143 Ill. 2d at 518, 587 N.E.2d at 959. Here, defense counsel never stated that she could not communicate with defendant or that she had doubts as to defendant's fitness to stand trial. In fact, defendant's counsel stated before sentencing that she had no reason to believe that since the finding of defendant's fitness, there was any reason to order another behavioral clinical examination. Although defendant's mother expressed concern about defendant's mental health and whether the psychiatric institute had his records, she never indicated that defendant could not understand the proceedings or that he was not fit to stand trial. Additionally, the court and defense counsel agreed that the psychiatric institute had all of defendant's mental health records prior to completing the second exam and Dr. Pan's report indicated that he reviewed these records in formulating his report. Thus, the record reflects that defendant was able to understand the nature of the proceedings and assist in his own defense and does not establish a *bona fide* doubt as to defendant's fitness. The court did not abuse its discretion in failing to *sua sponte* order a fitness hearing.

■ Next, defendant argues that the State failed to provide an adequate foundation for the forensic chemist's expert opinion that the substance contained cocaine. Specifically, he contends that the State failed to present evidence that the facts relied on by the chemist were of a type reasonably relied on by experts in the field, what tests were performed on the substance, whether these tests were generally accepted in the field, and whether the equipment used in testing and weighing the substance was functioning properly. Defendant contends that this argument attacks the sufficiency of the evidence and that the State failed to prove him guilty beyond a reasonable doubt, citing *People v. Raney*, 324 Ill. App. 3d 703, 756 N.E.2d 338 (2001).

First, we find *Raney* distinguishable. In *Raney*, the court found that the State failed to establish a proper foundation for the admission of the results from a gas chromatography mass spectrometer machine

used to test the suspect substance in a drug possession case. Based on this deficiency, the court reversed the defendant's conviction. However, in *Raney*, the forensic chemist testified at trial. Additionally, defense counsel in *Raney* repeatedly raised this issue at trial by objecting to the expert's lack of expertise and her testimony, asking for a directed finding based on the lack of foundation for the expert's opinion, and reiterating this contention in closing argument. *Raney*, 324 Ill. App. 3d at 705, 756 N.E.2d at 340. *Raney* is inapplicable to the present case, where the parties stipulated to the chemist's testimony and defendant never raised this issue in the trial court. See also *People v. Besz*, 345 Ill. App. 3d 50 (2003); *People v. Washington*, 343 Ill. App. 3d 889 (2003); *People v. Rucker*, 346 Ill. App. 3d 873 (2003) (all finding *Raney* distinguishable because it did not involve stipulated evidence).

We find that defendant waived this admissibility argument. Both a specific trial objection and a written posttrial motion are required to preserve an issue for appeal. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129 (1988). In this case, defendant never objected to the expert's opinion or otherwise raised this argument at trial or in his posttrial motion. More importantly, defendant actually took part in offering this evidence by agreeing to enter it through a stipulation. *Besz*, 345 Ill. App. 3d at 54. Generally, a defendant is precluded from attacking or contradicting any facts to which he previously stipulated. *People v. Gibson*, 287 Ill. App. 3d 878, 880, 679 N.E.2d 419, 421 (1997). A defendant waives any issue as to the impropriety of evidence if he procures, invites, or acquiesces in the admission of evidence. *People v. Pollard*, 225 Ill. App. 3d 970, 975, 589 N.E.2d 175, 178 (1992). Accordingly, this issue is waived.

Defendant responds that this issue attacks the sufficiency of the evidence against him, not the admissibility of the expert's opinion, and thus, cannot be waived. While defendant is correct that a sufficiency challenge cannot be waived, this court has previously rejected a defendant's attempt to recharacterize a foundational challenge as a sufficiency of the evidence claim. See *Besz*, 345 Ill. App. 3d at 54-57; *People v. DeLuna*, 334 Ill. App. 3d 1, 20, 777 N.E.2d 581, 598 (2002); but see *Washington*, 343 Ill. App. 3d at 899-900; *Rucker*, 346 Ill. App. 3d at 890-91. The *DeLuna* and *Besz* courts recently explained that a defendant's challenge to the foundation for an expert's opinion is an issue of admissibility of the evidence, not sufficiency of the evidence, and the defendant waived his right to raise this argument on appeal by stipulating to the expert's testimony at trial. See also *People v. Bynum*, 257 Ill. App. 3d 502, 629 N.E.2d 724 (1994); *People v. Williams*, 200 Ill. App. 3d 503, 558 N.E.2d 261 (1990).

We continue to adhere to the holdings of *DeLuna*[2] and *Besz* and note that several characteristics unique to stipulations further support our holding. First, had defendant made a timely objection at trial and not agreed to the State's stipulation, the trial court could have addressed this foundational issue and the State could have corrected the deficiency. *DeLuna*, 334 Ill. App. 3d at 20, 777 N.E.2d at 598. By presenting the chemist's testimony through a stipulation, in a brief and summary fashion, the result was to remove from the case any issue concerning the expert's testimony. *Williams*, 200 Ill. App. 3d at 516, 558 N.E.2d at 269. See also *People v. Polk*, 19 Ill. 2d 310, 315, 167 N.E.2d 185, 188 (1960) (finding that the "stipulation had the effect of eliminating proof which otherwise might have been required"). Additionally, the State likely would not have agreed to the stipulated testimony, thereby foregoing the opportunity to place the expert on the witness stand and ask him to describe in detail the number and type of tests performed on the substance, if the stipulation was not intended to eliminate the need for defending his testimony against a challenge by defendant. *Williams*, 200 Ill. App. 3d at 516, 558 N.E.2d at 269. Further, we assume that defense counsel, by agreeing to the stipulation, decided to forego the opportunity to cross-examine the expert to focus on other theories and aspects of the defense. *Williams*, 200 Ill. App. 3d at 516, 558 N.E.2d at 269.

Defendant relies on *People v. Terry*, 211 Ill. App. 3d 968, 570 N.E.2d 786 (1991), *People v. Gibson*, 287 Ill. App. 3d 878, 679 N.E.2d 419 (1997), *In re R.F.*, 298 Ill. App. 3d 13, 698 N.E.2d 610 (1998), *People v. Moore*, 335 Ill. App. 3d 616, 781 N.E.2d 493 (2002), *People v. Cowans*, 336 Ill. App. 3d 173, 782 N.E.2d 779 (2002), and *People v. Lundy*, 334 Ill. App. 3d 819, 779 N.E.2d 404 (2002), to support his argument that a challenge to the foundation for the expert's opinion should be reviewed as a sufficiency of the evidence claim. However, all of these cases are distinguishable because they involved attacks on the chain of custody of the substance and not the foundation for the experts' opinions. Thus, these cases are inapplicable here.

We note that *Rucker* and *Washington* involve defense challenges to the foundation for the experts' opinions and those courts addressed

---

[2]Defendant's attempt to distinguish *DeLuna* is unavailing. *DeLuna* is not "in direct conflict with the decision in *Raney*," as defendant argues, because the defendant in *Raney* adequately preserved his challenge to the chemist's testimony by objecting at trial, not stipulating to the expert's testimony, and raising the issue in his motion for a directed finding and in closing arguments, whereas in *DeLuna*, the defendant failed to object at trial or raise the issue in a posttrial motion.

the issue as a sufficiency of the evidence claim, not as an admissibility issue. Both cases rely on *Cowans*, which, as discussed above, concerns only a chain of custody claim and not a foundational challenge and neither case cites or discusses *DeLuna*. As explained above, we find *DeLuna* and *Besz* persuasive and hold that a defendant's challenge to the foundation for an expert's opinion is an issue of admissibility of the evidence which is waived on appeal when the defendant stipulated to the expert's opinion at trial. To the extent *Rucker* and *Washington* hold that a defendant's foundational challenge to expert testimony to which he stipulated at trial is an attack on the sufficiency of the evidence and, thus, a defendant can raise this issue for the first time on appeal, we decline to follow them.

In his reply brief, defendant contends that if this court were to find that he waived this issue because he stipulated to the expert's testimony at trial, we should apply the plain error doctrine and address his claim. However, we find that by stipulating to the chemist's testimony and objecting only on appeal, defendant injected error into the trial. "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). By consenting to the admission of the stipulation at trial, defendant agreed to proceed in one direction and cannot now object to the admission of that stipulation for the first time on appeal. *Besz*, 345 Ill. App. 3d at 57. Active participation in the direction of proceedings goes beyond mere waiver. *People v. Villarreal*, 198 Ill. 2d 209, 227, 761 N.E.2d 1175, 1184 (2001). If a defendant injected error into his trial, it would be illogical and counterintuitive to then apply the plain error doctrine on appeal and address the merits of his claim, especially here where the alleged error does not affect defendant's fundamental or substantive rights. *DeLuna*, 334 Ill. App. 3d at 20, 777 N.E.2d at 598; *Bynum*, 257 Ill. App. 3d at 515, 629 N.E.2d at 733. See *Villarreal*, 198 Ill. 2d at 227-28, 761 N.E.2d at 1184-85 (finding that defendant could not directly attack jury verdict forms because defense counsel submitted these forms at trial and holding that "allow[ing] defendant to object, on appeal, to the very verdict forms he *requested* at trial, would offend all notions of fair play" (emphasis in original); *Polk*, 19 Ill. 2d at 315, 167 N.E.2d at 188 (stating that, having stipulated, defendant "cannot complain of the evidence which he has stipulated into the record"). Accordingly, we decline to review defendant's claim as plain error.

■ Lastly, defendant argues that the mandatory Class X sentencing provision of section 5—5—3(c)(8) of the Code, under which he was sentenced, is unconstitutional under *Apprendi v. New Jersey*, 530 U.S.

466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Specifically, defendant contends that, pursuant to *Apprendi*, the State is required to submit to a jury and prove beyond a reasonable doubt the fact of the defendant's age and prior convictions, and the fact of the timing, degree, number and sequence of the defendant's prior convictions. The State responds that *Apprendi* does not apply to recidivist provisions such as section 5—5—3(c)(8).

In *Apprendi*, the United States Supreme Court stated that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. The *Apprendi* Court thus carved out an exception for recidivist legislation, which had previously passed constitutional muster in *Almendarez-Torres v. United States*, 523 U.S. 224, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998). *People v. Dixon*, 319 Ill. App. 3d 881, 884, 747 N.E.2d 1, 3 (2001).

Based on its analysis of *Apprendi* and *Almendarez-Torres*, this court has repeatedly held that section 5—5—3(c)(8) is constitutional. See, *e.g.*, *People v. Burks*, 343 Ill. App. 3d 765 (2003); *Rucker*, 346 Ill. App. 3d at 894; *People v. Bell*, 343 Ill. App. 3d 110, 118, 796 N.E.2d 1114, 1121 (2003); *People v. Smith*, 338 Ill. App. 3d 555, 561, 788 N.E.2d 1204, 1209 (2003); *People v. Lundy*, 334 Ill. App. 3d 819, 834, 779 N.E.2d 404, 417 (2002); *People v. Young*, 334 Ill. App. 3d 785, 794, 779 N.E.2d 293, 300-01 (2002); *People v. Wallace*, 331 Ill. App. 3d 822, 838, 772 N.E.2d 785, 800 (2002); *Dixon*, 319 Ill. App. 3d at 884-85, 747 N.E.2d at 3-4; *People v. Givens*, 319 Ill. App. 3d 910, 914, 747 N.E.2d 436, 439 (2001); *People v. Roberts*, 318 Ill. App. 3d 719, 723-24, 743 N.E.2d 1025, 1033 (2000); *People v. Lathon*, 317 Ill. App. 3d 573, 587, 740 N.E.2d 377, 387 (2000). In *Lathon*, this court rejected the exact argument made by defendant here, that because *Apprendi* calls into question whether *Almendarez-Torres* was correctly decided, we should conclude that *Apprendi* holds that enhanced sentencing under section 5—5—3(c)(8) violates a defendant's right to trial by jury and due process. *Lathon*, 317 Ill. App. 3d at 584, 740 N.E.2d at 384. See also *Smith*, 338 Ill. App. 3d at 558-61, 788 N.E.2d at 1206-09. *Lathon* looked at *Apprendi*'s review of *Almendarez-Torres* and determined that the *Apprendi* Court not only endorsed the recidivism exception, but articulated reasons for such an exception, including the fact that procedural safeguards enhance the validity of any prior conviction, recidivism is not an essential element of the underlying criminal offense and recidivism does not relate to the commission of the underlying offense. *Lathon*, 317 Ill. App. 3d at 585-86, 740 N.E.2d at 385. *Lathon* found that the same reasons supported applying the recidivism

exception to section 5—5—3(c)(8). *Lathon*, 317 Ill. App. 3d at 585-86, 740 N.E.2d at 385. We agree with the analysis in *Lathon* and *Smith* and find section 5—5—3(c)(8) constitutional.

Additionally, this court has upheld the minimum age and other ancillary elements of section 5—5—3(c)(8), finding that the objective subject matter of section 5—5—3(c)(8) is recidivism and these factors are sufficiently intertwined with recidivism and distinct from the elements of the underlying offense to fall under the recidivism exception recognized in *Apprendi*. *Smith*, 338 Ill. App. 3d at 561, 788 N.E.2d at 1209; *People v. Dunn*, 326 Ill. App. 3d 281, 289, 760 N.E.2d 511, 519 (2001); *People v. Jones*, 322 Ill. App. 3d 236, 243, 749 N.E.2d 466, 471 (2001); *People v. Watson*, 322 Ill. App. 3d 164, 168, 749 N.E.2d 1078, 1081-82 (2001); *Dixon*, 319 Ill. App. 3d at 885-86, 747 N.E.2d at 4; *Givens*, 319 Ill. App. 3d at 914, 747 N.E.2d at 439. Moreover, defendant did not dispute at trial that he met all of the conditions precedent, including his age, for Class X sentencing under this statute and the presentence investigation report contained all of the necessary facts. *Dixon*, 319 Ill. App. 3d at 885-86, 747 N.E.2d at 4. We decline defendant's request to depart from this settled precedent and reject defendant's argument that section 5—5—3(c)(8) violates the holding in *Apprendi*.

Defendant also contends that section 5—5—3(c)(8) is unconstitutional under the Illinois Constitution's right to a jury trial, independent of any violation under *Apprendi*. Aside from his *Apprendi*-based arguments, defendant gives no reason why this court should construe the due process guarantees of the Illinois Constitution more broadly than *Apprendi* interpreted due process under the United States Constitution. The *Apprendi* Court adequately explained why the additional due process safeguards imposed for sentencing under New Jersey's hate crime statute need not be imposed with respect to recidivist statutes. *Dixon*, 319 Ill. App. 3d at 886, 747 N.E.2d at 4. We find no reason to construe this state's due process guarantees differently from their federal counterparts. *Dixon*, 319 Ill. App. 3d at 886, 747 N.E.2d at 4. Additionally, we note that this court has consistently found that section 5—5—3(c)(8) does not violate the Illinois Constitution. *Rucker*, 346 Ill. App. 3d at 894; *Smith*, 338 Ill. App. 3d at 563, 788 N.E.2d at 1211; *Jones*, 322 Ill. App. 3d at 243, 749 N.E.2d at 472; *Dixon*, 319 Ill. App. 3d at 886, 747 N.E.2d at 4. See also *People v. Pittman*, 326 Ill. App. 3d 297, 301-02, 761 N.E.2d 171, 175 (2001) (rejecting a similar challenge to the constitutionality of another extended-term statute that extends a defendant's sentence based on prior convictions). Accordingly, we reject defendant's argument.

636

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

HARTMAN and GREIMAN, JJ., concur.